We have four cases on the calendar this morning. A case from the Board of Contract Appeals, a patent case from the District Court, two government employee cases, one of which is Navy v. Cath-Dr, Baltimore, 06-1359, Mr. Woolock. May it please the Court, we ask that this Court reverse the decision that the ASPCA and the claims that are at issue in this appeal because the Board erred when it ignored the plain language of the contract that states the contracting officer responsible for this contract is the only person in power to make compensable changes under this contract. And also the plain language of all the other contract-related documents that communicated to the contractor when they had requests for information. What about the role of the project manager? The project manager was there basically to give technical advice on a day-to-day basis. And to resolve problems. Yes. And isn't what all of these modifications are about, resolving problems? In a general sense, yes, I would agree with that. But the project manager's job here was to resolve technical issues, and as he made clear in his disclaimers that if there was a further problem about whether the contractor was to receive additional compensation for this work, the contractor had to go to the contracting officer and present a claim. Well, counsel, so you're saying the ROICC was not, under the contract, able to make modifications? No. Okay, so why don't we look at appendix, page JA149, because this is my understanding are the slides the government presented at the pre-construction conference, which by contract the CO was expressly required to attend. And the government slide in the middle of the page on JA149 has the header, contract modifications. And you see that first bullet point that says bilateral modification, the contractor and the ROICC have agreed upon an adjustment to the contract. And the next bullet point is unilateral modification. The ROICC can direct the contractor to take some action under the contract. Aren't those modifications? I mean, the header there is contract modifications. It talks about how they have to be in writing, not oral, and then goes on to explain how they can be done bilaterally by the contractor and the ROICC and unilaterally by just the ROICC. Yes. In this case, though, the requests for information were we've identified some work that we think we have to do. Is this within the contract? Do we have to do this work? And the response in every case was yes, you have to do the work, and it's already included in the contract under the request. In that respect, it's not a modification to the contract. It's instructions that the contractors do the work for which they are already agreed to do and were already being paid. But do you now agree, though, that the ROICC would have been able to make modifications based on this slide the government presented at the pre-construction conference? Because you started off by saying no, the ROICC was not able to make modifications to the contract. So I just want to make sure that we're on the same page. Do you agree that this slide certainly implies that he is able to? To the extent that the ROICC officer is the contracting officer and has a warrant to do that, yes. And I apologize if I misspoke with that. Wait a minute. Now you just changed things. So now you just said to the extent the ROICC is the contracting officer. Well, that's not, doesn't seem to me to be what's required, does it? Under the contract, under the contract clauses, yes, it has to be the contracting officer. These guidelines here are not the contract itself. And the contractor is supposed to be relying on the contract they had signed. But did you say before that the changes that are at issue here are within the scope of the contract? Yes. But wasn't there a finding by the board below which you have an appeal that found that the changes were not within the scope of the contract? Or am I mistaken about that? I think that is wrapped up in our appeal. To the extent that the board found that those were outside the scope of the contract, they ignored the evidence of the project manager's communications saying that they were not. So that's a finding? That's something you've appealed here? That's within your appeal? Yeah, I would say that it is within the scope of our appeal. Do you think that's clear from your briefs? That's a hedged statement. I would hope that it would be clear from our briefs. Leaving aside for a moment the contracts and the specificity, even if we agree or at least appreciate the government's position with respect to how one would construe the contracts here, if we accept the court below's findings with respect to the spec being defective or that the work was outside the spec, what is a contractor supposed to do? If he comes to a situation and he or she is unable to comply with the specification requirements because of the situation on the ground, then isn't he met with, under your view, isn't he met in a catch-22 situation? I mean, he can do the work but conceivably not get paid for it, which is what happened here, or he can refuse to do the work and then it seems to me he'll be in noncompliance with the contract. And this situation all presents itself because a situation arose on the ground in which he is not able to specifically comply with the specifications as they exist. In this case, and with all these claims, what the contractor was supposed to do was begin as it did, seek advice from the technical representative, receive further instructions on what to do, and then also follow not only the contract but the technical representative's direction that if they disagree that this work is within the scope of the contract, go to the contracting officer and raise your issue about compensation with that person. But how is he supposed to know that they disagree? I mean, they say, okay, we expected to find such and such, but it's not, so we have to do all this additional work, and they both agree that all this additional work should be done. How is he supposed to know that that's considered outside the scope of the contract? I'm sorry, I'm not sure I understand. Are you saying how is the contractor supposed to know that it's considered? Yes, yeah, yeah. How is the contractor supposed to know that he's supposed to go to the contracting officer? If there seems to be agreement on the ground that this is the work that ought to be done. The agreement on the ground is about the work and what actually has to be done. The issue of extra compensation was never raised at that point, but also when the project manager sent back his recommendation as to what work needs to be done on every single one of these, there was an instruction or a disclaimer or something to the extent that said, do the work, this does not constitute a compensable change. If you disagree, go to the contracting officer. Didn't the board find, and that's a matter of fact, the board found that those statements on the bottom were on the bottom of every piece of paper the man ever shuttled to and from. I think his personal stationery probably has those words on the bottom as well. And the board found, though, as a matter of fact, that that language was so frequently used and wasn't intended for that purpose, that you couldn't rely upon that blanket disclaimer on the bottom of every page of his stationery as really meaning that. I remember the board finding that as a matter of fact. Yeah, I believe the board used the phrase surplusage, and that was meant to be something to that extent. We disagree with that assessment. That particular disclaimer was not on the bottom of every single page. Some of them, yes. Others, there were check boxes with a similar message. Two of them, one, this is a compensable change, one, it's not. And you check the one that says it's not. Others, in the architect and engineer's report, there was a disclaimer at the top of the report that said nothing that we're putting in here constitutes anything that would require extra time or compensation for you. There were different messages in each case. And in some of the cases, the project manager exercised some sort of action that demonstrated he knew the difference as to whether this applied or not. Do you mind if I move you to ratification for a second? Go ahead. I wanted to ask you, if we were to agree that there was no express and no implied authority, it seems that the contractor could still win if Mr. Melan's changes had been ratified by the CO. You would agree with that, right, if they had been ratified? As a general proposition, yes. And you think in this case they weren't? Correct. What is the final decision by the CO himself saying, was it 13 or 14 of these adjustments were warranted and ought to be compensable? And I leave it to you all to work out the details of how much to pay. How come that action, apart from anything else? I mean, disregard the course of conduct argument they raised, but why isn't his final decision in and of itself ratification? To begin, I'd like to sort of be clear as to what his final decision was. That particular letter, which was a July 27, 2001 letter, said there are two components to that decision. Number one, all of those that found him were denied, that was the final decision. For those who were directed to go back and sort of find entitlement and negotiate a compensation on each claim, it said specifically his final decision was held in vain, which contemplates after you've negotiated something you still need to come back to the contracting officer and make sure that it's approved by the person with the warrant authority to grant extra compensation. So there wasn't a final decision on any of those at that time. So therefore, to the extent that Cath argues that there's some sort of ratification based on that document, there's not. There was no official action taken. And on many of these claims, almost three-quarters of them, in that document the contracting officer did deny the claims. And so there would be no ratification of any assumed... What about Claim 3? Claim 3. Did the government even appeal in Claim 3? Yes, that is in our brief there. I realize we didn't specifically address it. Well, you've got a problem, haven't you, on Claim 3? I mean, why isn't Cath... This is sort of different than many of the others, and the board found that Cath is entitled to an adjustment under the different site condition clause. And if you look at that clause, it seems that indeed there's an equitable adjustment that will include increased costs reasonably incurred by the contractor. So if there's a conclusion that it's a different site condition, then what's wrong with the requirement of payment of the money? I think on the issue of when this was raised to the project manager, the same sort of language was used, that it wasn't treated that way, and Cath then submitted its claim at the end. So are you appealing the conclusion by the board that this adjustment fell under the different site condition clause? We're appealing it to the extent that it drew any sort of conclusions based on the fact that it ignored the language by the project manager and in the contract that allowed only the contracting officer to make compensable changes or decisions. Well, am I wrong, but if it falls under the different site condition clause, then that seems to be an exception, at least as I read the FAR rule to this contracting officer clause? I mean, this FAR rule that's cited seems to say that the government's responsible for increased costs reasonably incurred by the contractor in attempting to comply with the defective specification. So does that not trump the contracting officer clause thing that the government's relying on? It could. Close question. You're in your rebuttal time. Would you like to save it or use it? I'm going to save it, thank you. Mr. Frostmark. Good morning. The important principle here is the difference between reality and what actually happened on the ground when the contractor was building this building and in the fiction that the government was trying to create after the fact. The Navy's overarching argument in the papers filed before this court is that Cathar Paltry should have involved the contracting officer throughout the project. The problem with this argument is the Navy excluded the contracting officer from the outset of the project. The Navy made the contracting officer's abdication of his contract administration responsibility abundantly clear to Cathar Paltry from the award of the contract and maintained that position until all performance issues ended. But doesn't CathóCath read the contract, obviously. Don't they have some obligation? I mean, this language is in the contract. Should not the inconsistencyó accepting all of what you say about the course of conductó should not the inconsistencies that were occurring at least require Cath to make some inquiry specifically about this provision, given the clarity of the language in that clause? They did that, and that was in R540, which is in Adjoint Penix 157. They asked, what is the level of authority of the people that are telling us to do these things? And in response, they saidóin response, the government saidó that the project manager's responsibility is to resolve problems that arose during the performance of the contract, which the boardó The question you posed, which is what is the authority of the people telling us to do something, seems to me as a little different than the question of are we going to get paid for this, which the contract clause clearly seems to clearly have indicated as only something that the contracting officer can do. There's two contract clauses at play here. There's the oneóthe only clause that the government wants us to look at is the contracting officer's authority clause. And the second clause, the government representative's clause, which is found on Adjoint Penix page 131. In that clause, I look at it like a Venn diagram. Both involve modifications of the contracting officer's authority. One, the contracting officer's authority clause, involves directives. Some inspector goes out and says, change this, change that. Under that clause, the contractor would have a responsibility to go to the contracting officer and say, is this a change or not? But the government representative's clause on 131 says it doesn't have a requirement that Katherine Volpe go to the contracting officer before performing the change. It only says that if the authorized representative of the contracting officer gives a directive that changes the contract, then at that point, that modification must be formalized prior to the end of the project. The big difference between these two clauses is that one has an obligation to contract the contracting officer before performance. The other one only says, just go to the contracting officer before the end of the job. And that's consistent with that PowerPoint presentation that was brought up in the government's statement. It made it very clear that the contracting officer's only role in this project was to consider certified claims. Every other aspect of contract administration was to be handled by the ROIC office. These are two... Counselor, I'm having problems understanding the government representative clause to mean what you're suggesting it means. Because as I'm looking at it, it explains the contract will be administered by an authorized representative of the contracting officer. But then it goes on to say, in no event, however, will any understanding or agreement, modification, change order, or other matter deviating from the terms of the contract between the contractor and any person other than the CO the effect of abiding on the government unless formalized by proper contractual documents executed by the CO. It doesn't say executed by the CO afterwards at the end as part of a final decision. It says nothing will be changed unless executed by the CO in formal proper contract documents. But it says executed by the CO, but then it says right after that, prior to completion of the contract. If you look at the contracting officer's authority clause, there's an extra sentence in there that says, the contractor is hereby put on notice that in the event a government employee other than the contracting officer directs a change in work to be performed or increases the scope of work to be performed, it is the contractor's responsibility to make inquiry to the contracting officer before making the deviation. That requirement is not in the government representative's clause. Why does it need to be? It's in the earlier clause. So why doesn't it bind you? Read the sentence after the one that you just quoted. It says payments will not be made without being authorized by an appointed contracting officer with the legal authority to bind the government. Right. Well, then I don't understand why the two clauses, then why not just leave the one clause in? Well, redundancy is not a crime in the bureaucracy of the government. I understand that, Your Honor. But I do think that there is a timing difference in the clause. In the government representative's clause, an authorized representative of the government, it does contemplate that they'll make changes to the contract. But it says that in that case, you have to go to the contracting officer prior to the end of the contract. And that's what they did. And taken in the context of what the contractor was faced, at the start of the project, a Navy lieutenant commander and his staff went before the contractor and said, this is what you do. This is how you administer this contract. You send all communication to my project manager. If we want to change the contract, I change the contract, whether it's a direct order from me or whether it's agreement between us. I think there's a lot to ask of a contractor to totally disregard that directive from the lieutenant commander who's in charge of all construction projects at that base and say, no, no, no, no, I'm not going to do that. I'm going to do what the contracting officer said. They even, just to delay any confusion, they submitted an RFI at the early stages of the project and said, what is your authority here? And the Navy, in response, gave a detailed explanation of what the authority of the project manager was. That included resolving problems. It included preparing contract modifications. And at that point, I think the contractor was justified and it was reasonable for the contractor to say, okay, I'm only dealing with him. That's what I was told at the beginning of the project. I submitted an RFI. This is what I was told, and this is the way it was. Let me just shift your attention before time runs out to the question I asked the government on Claim 3. Is it, with respect to Claim 3, does the contractor need approval from the contracting officer when they're differing site conditions? No. Under the differing site condition clause, if there's five elements met and the board found it was a factual determination that all five elements were met, then there was a different condition between what was described in the contract and what was actually encountered on site. And that's exactly what happened. There was a location that was on top of a roof in this large building that couldn't be accessed during the bidding stage of the project. The specifications specified that there would be a certain kind of roofing material up there, which had a certain cost to remove and replace. The one up there was a totally different kind of material, and as explained in the appendix, what happened was when the architect prepared the specs, he didn't realize that there was a follow-on roofing contract that occurred after he prepared the specifications. And as a result of that, the contractor encountered a differing site condition, a different roof than what was specified. And that issue is unique to Claim 3, right? Yes, and that issue is dead. And from my reading of the briefs, I didn't find any justification in the government's brief to have that set aside on the substantial other than the statement. A couple other points before I run out of time. The government makes a point in its brief. It claims that Tim Melland, who was the project manager for most of the project, in our brief, he was also the engineer in charge, as identified in the pre-construction conference. That's in Joint Appendix 136. He continued in that position throughout the course of the project, and that can be found in the testimony of Navy Conrad Larry Campion. That's on Joint Appendix 302. The government's citations to the record fail to indicate that Tim Melland vacated the role. They just said that he took on administrative responsibilities as the project manager in February of 1999. But they don't say that he left the role of EIC. And no one else took the position of authorized representative contracting officer. So the record is clear that Tim Melland was both the EIC and the growth project manager during the course of the project. Um... Counsel, say we disagree with you on the express authority, and thereby disagree with the board, actually, on whether or not there was express authority for Mr. Melland to do it. The board still found implied authority, right? Well, to be honest, the board isn't exactly 100% clear on that. It appeared what the board said was we could find implied authority here, and it's not in an urban pathfinder's case. But we find that there was actual authority here. The fact is that, under the facts identified in the briefing that are in the record, implied authority works here as well. And the government's argument essentially was there was no finding of an expeditious need to change the contract, and therefore, implied authority doesn't work. But that's not the standard this court has adopted. There's no requirement that there's an expeditious need. But that's what urban pathfinders... That's what urban pathfinders... But there are other cases, like Landau, decided by this court, like SIPCO, where there isn't an expeditious finding, and the still-complied authority is found when there's a key government employee with a lot of responsibility, and it logically flows from that responsibility that he would have the right to modify the contract. And that's what happened in this case. There's one point of contact on this. He was the architect that prepared the specs. He was a project manager that administered the contract. And when Captain Arvalti had issues during the course of the project, it went to him, and he would advise the contractor what to do. And the contractor followed. One other point about the boilerplate language at the bottom of the RFI forms. It was surplusage. It was treated as surplusage. And the example that I'd like to quote is Claim 13. In Claim 13, which was raised initially in RFI 69, which is under Ordinance 17, the government responds on that and says you have to provide flashing. And at the bottom of that RFI, it says something to the effect that this is a change. It was the standard boilerplate language. But that wasn't the end of the story. On that same day that the RFI was raised, the project manager sent Captain Arvalti a fax, and that can be found on Joint Appendix 242. And that fax said this is a change. This is a change to the contract. So it was clear at the time that even the project manager knew that that language, even though it said it's not a change, there's a separate document sent on the exact same day that the RFI was sent that it's not changed. Similarly, the government made it seem that what would happen is the RFI would be sent, a response would be given, and that would be the end of the story. But Captain Arvalti did nothing else and just ignored the language at the bottom of the contract. But that's not what happened. In many cases involving these claims, there was a separate, what's called an NOCC, which is Notice of Change Condition, that was sent after the RFI, but before they performed the work. For instance, on Claim 7, and this is in the record, Notice of Change Condition sent after the RFI that first raised the point. That's Joint Appendix 165. Similarly, Claim 17, Notice of Change No. 6, 166, was sent after the RFI. So if the government's been content, well, they should have known from the language at the bottom of the RFI that this wasn't a change. Well, then after that, but before they performed the work, the contractor would send a Notice of Change Condition to say, look, you might not say it's a change condition, but we think it is. We'll proceed because we don't want to be terminated on this job, but this was a change condition. Counsel, can we go back for a second to the implied authority idea? I was surprised that the government didn't cite Harbor v. United States in its brief, which is one of our 1998 cases, and seems to be the closest one on point with regard to implied authority. Are you familiar with this case? I'm sorry. No. OK, well, actually what this case says, it's got some sweeping language, and it's from our court, and it says if there is a contract that expressly provides authority to someone else, then you can't give implied authority to somebody else. So if they said in an instance where there's a contract that is expressly clear upon who has the authority, then implied authority can't be found in another person. It's pretty broad language. Well, my response to that is similar to the statements I raised before about the two clauses. I'm not sure how persuasive it was for the court, but the way I see the government representative's clause is it does convey authority. It specifically conveys authority for the authorized representative, the contracting officer, to make decisions of a technical nature. When asked to further explain what that meant in RFI 40, which is joint appendix 157, they said, OK, what this means is that you can resolve problems, you can prepare contract modifications. And with that further explanation, I think that the contract did not limit the authorized representative of the contracting officer to never issue a contract modification. So do me a favor and then turn to the issue of ratification, if you don't mind, with your one remaining minute. Tell me which acts you think it is that constitute a ratification. The key point here on the final, first of all, this is a very formal document. This is the contracting officer's final decision. The contracting officer had a year to consider this. They wrote a 15-page, detailed decision. Clearly, they knew that these acts rose out of the air between the project manager. And in response to this, the contracting officer said, project manager, Roy's office, you negotiate the changes to this contract. Clearly, that showed at that point, after the contract was over, that the individuals with the authority to negotiate changes to this contract on behalf of the contracting officer was the Roy's office. They didn't say, come to me and let's negotiate a change. Let's negotiate modifications at some, you and I do it. He excluded himself from the project, saying, I refer this back to the Roy's office. You negotiate a change to the contract. At that point, it's clear to me that the contracting officer ratified the authority, which is the key point here. He's ratified the authority of the Roy project manager to negotiate changes to the contract, because that's what he tells the contractor to do. Also, they make the point that it's a letter, not a final decision. The statement at the end of the contracting officer's final decision on Joint Appendix 278 says, this is the final decision of the contracting officer and identifies its appeal rights. In fact, Katya Volpe exercised those rights. Is there a question? Thank you, Mr. Proxmire. Mr. Wallach, we'll give you your three minutes. Thank you. I'll start off with the ratification. The state of the law is that ratification is for specific acts that would otherwise be beyond someone's authority to do something. Not to generally ratify giving a warrant power to someone who it's not otherwise given to. And so under the law in this court, and really probably any court, Kat's argument can't work. If there's to be any ratification here instead of specific things, the contracting officer can simply say, OK, now, without any proper paperwork or authorization, I'm going to give this power to my project manager. The two clauses, the two contract clauses that are in play here, the government is happy to have the court look at both of them because they do say the same thing with respect to compensable changes. I think as Judge Brewer pointed out, I'm just going to make that clear. Thank you. With respect to the applicability of the government representative's clause to Mr. Malland as the engineer in charge. Government representative's clause delegates technical authority, not compensable change authority, to the engineer in charge. Mr. Malland was the engineer in charge at the pre-construction meeting. Shortly after that, vacated that position. He was only the project manager. The citation that Kat gave you was a general question. It did not specify when a particular person was the engineer in charge. So you're saying Mr. Malland was the engineer in charge at the pre-construction meeting? Was he the CO? No. Who was the CO at the pre-construction meeting? I believe it was the woman named Sally Millett. Did the CO attend the pre-construction meeting? Yes. And what was the name of the CO? I believe it was Margaret McKeon. She wasn't around a lot, was she? I'm afraid I don't understand your question. Well, you know what? On page JA-137, it lists everyone who is present at the meeting in your slide, at least. And her name is not here. On JA-137, I'm assuming since you're listing all the personnel relevant to the contract, these are all the people who were present at the meeting. It lists all the contractor personnel who were present. Just make sure you sign in on the attendance sheet and the whole thing. I thought I read somewhere that she wasn't there, and I didn't think the government was disputing that. I'll rely on whatever you submitted before. In this particular contract, like many, there is a hierarchy that is established so that things can operate as smoothly as they can, where people have multiple responsibilities. I think your time is up, Mr. Wallach. Any questions from the panel? Thank you very much. Case to be taken under revised. Next case is.